Keith DAMBROT, Plaintiff–
Appellant/Cross–
Appellee,

Lakeith Boyd, et al., Plaintiffs/Cross–
Appellees,

v.

CENTRAL MICHIGAN UNIVERSITY,
et al., Defendants–Appellees/Cross–
Appellants.

Nos. 94–1015, 94–1056 and 94–1908.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 2, 1995.

Decided June 5, 1995.

Robert A. Sedler (argued and briefed), Wayne State University Law School, Detroit, MI, James Schuster (briefed), Southfield, MI, for Keith Dambrot.

Leonard M. Niehoff (briefed), Robert M. Vercruysse (argued and briefed), Bernice M. Tatarelli (briefed), Butzel, Long, Gust, Klein & Van Zile, Detroit, MI, Steven W. Martineau, Lynch, Gallagher, Lynch, Shirley & Martineau, Mt. Pleasant, MI, for Central Michigan University, Leonard E. Plachta, Russ Herron and Dave Keilitz in Nos. 94–1015 and 94–1056.

Robert M. Vercruysse (argued), Bernice M. Tatarelli, Butzel, Long, Gust, Klein & Van Zile, Detroit, MI, for Central Michigan University, Leonard E. Plachta, Russ Herron, Dave Keilitz in No. 94–1908.

Before: KEITH and NELSON, Circuit Judges; BELL, District Judge.[*]

KEITH, Circuit Judge.

There are two sets of plaintiffs in this case (collectively the "Plaintiffs"). The first is Keith Dambrot, ("Dambrot") former head coach of Central Michigan University's men's basketball program. The second includes five students [1]—Leonard Bush, Deshanti

---

[*] The Honorable Robert Holmes Bell, United States District Judge for the Western District of Michigan, sitting by designation.

[1]. When Dambrot filed his initial Complaint on April 19, 1993, he was joined by nine members of the University men's basketball team. Approximately one week later, an additional student plaintiff was added. On June 16, 1993, the claims of student plaintiffs Daniel West, Mario Patterson, and Marcus Culbreth were voluntarily dismissed with prejudice. On July 8, 1993, the claims of student plaintiff Torey Mills were vol-

Foreman, Keith Gilmore, Tyrone Hicks, and Amere May (collectively the "Student Plaintiffs")—who were members of the 1992–93 Central Michigan University ("CMU") men's basketball team coached by Dambrot. Defendants are CMU and Leonard E. Plachta ("Plachta"), Russ Herron ("Herron"), and Dave Keilitz ("Keilitz") officially and in their private capacities (collectively "Defendants" or "CMU").[2] Dambrot appears before the court appealing the grant of summary judgment in favor of Defendant CMU regarding his wrongful termination claim.[3] Defendants cross-appeal the district court's grant of summary judgment in favor of Plaintiffs regarding the unconstitutionality of CMU's discriminatory harassment policy. Defendants also cross-appeal the district court's award of attorney's fees to the Student Plaintiffs. The Student Plaintiffs come before the court as cross-appellees. For the reasons stated below, we **AFFIRM** the district court's grant of summary judgment in favor of Plaintiffs finding the CMU discriminatory harassment policy violates the First Amendment. We also **AFFIRM** the district court's grant of summary judgment in favor of Defendants finding CMU's termination of Coach Dambrot's employment does not violate the First Amendment. Finally, we **AFFIRM** the district court's award of attorney's fees.

## I. Statement of the Case

On May 12, 1991, Dambrot became the head coach of the Central Michigan University men's basketball team. His responsibilities as head coach included, among other things, offering and renewing player scholarships, deciding which players could remain on the team, determining the amount of playing time for each player and selecting assis-

tant coaches. This lawsuit arises from events which occurred during the 1992–93 men's basketball season.

The 1992 CMU men's basketball team was made up of eleven African Americans and three Caucasians.[4] The team's full-time coaching staff included two assistant coaches, Derrick McDowell (an African American) and Barry Markwart (a Caucasian). The part-time coaching staff included one voluntary graduate assistant, Chip Wilde (a Caucasian), three managers (all Caucasian), and a professional trainer (a Caucasian).

In January of 1993, Dambrot used the word "nigger" during a locker room session with his players and coaching staff either during the halftime or at the end of a basketball game in which the team lost to Miami University of Ohio. According to Dambrot's testimony, Dambrot told the players they hadn't been playing very hard and then said "Do you mind if I use the N word?" After one or some of the players apparently indicated it was okay, Dambrot said "you know we need to have more niggers on our team.... Coach McDowell is a nigger, ... Sand[er] Scott who's an academic All-American, a Caucasian, I said Sand[er] Scott is a nigger. He's hard nose, [sic] he's tough, et cetera." He testified he intended to use the term in a "positive and reinforcing" manner. The players often referred to each other using the N-word during games and around campus and in the locker room. Dambrot stated he used the word in the same manner in which the players used the term amongst themselves, "to connote a person who is fearless, mentally strong and tough."

Prior to the January incident, the record shows Dambrot had used the N-word on at

untarily dismissed with prejudice. On July 19, 1993, the claims of student plaintiff Lakeith Boyd were voluntarily dismissed with prejudice.

**2.** Plachta, for all times relevant was the CMU President. Herron, for all times relevant was the Vice President for University Relations. Keilitz was, for all times relevant, the CMU Athletic Director.

**3.** Dambrot also brought claims for violation of his due process rights, the Elliott–Larsen Civil Rights Act and for defamation. The district court granted summary judgment in favor of

Defendants on the first two claims. Dambrot has not appealed these judgments. The district court noted that Dambrot and the Defendants stipulated to dismiss, without prejudice, the defamation count "in order that limited discovery could proceed focused upon the motion at issue herein." As a result, the district court has withheld and deferred action on the stipulated dismissal. See *Dambrot v. Central Mich. Univ.*, 839 F.Supp. 477, 480 n. 3 (E.D.Mich.1993).

**4.** The team had included two other African Americans, but they quit the team early on.

least one other occasion. In November, Dambrot apparently addressed the team after a practice and said he wanted the players to 'play like niggers on the court' and wished he had more niggers on the basketball court. He then said he did not want the team to act like niggers in the classroom. When asked why he made these statements Dambrot stated:

> Well, that's really a very easy question for me to answer, because we had had an incident early in the year where we had five or six basketball players, some of our bigger kids on our team, in a math class. And our kids were aggressive, tough, you know, a little bit loud, abrasive. And the lady was intimidated, because it was the first year that she ever had taught. And they almost got kicked out of the math class. A matter of fact, Dave Keilitz, myself, Pat Podoll, Doug Nance, who is the faculty rep, and then the head of the department,—I don't remember his name—the math department, met and discussed the situation. And it was my feeling that you can't be aggressive, tough, hard-nosed, abrasive in class, or you're going to get thrown out of classes, especially at a school like Central Michigan where the faculty members don't understand a lot about black people or have many black people in class. And I think our players understood what I meant by, "Don't be niggers in the classroom."

JA at 504.

The news Dambrot had used the N-word in the locker room incident became known to persons outside the basketball team. In February 1993, Keilitz interviewed members of the men's basketball team at Dambrot's request. Keilitz reported all the African American players he interviewed said they were not offended by the coach's use of the term. At some point after those interviews, a former member of the men's basketball team, Shannon Norris, complained to the university's affirmative action officer, Angela Haddad, regarding Dambrot's use of the N-word during the November incident. The affirmative action officer confronted Dambrot who admitted using the word but stated he used it in a positive manner. The officer

viewed Dambrot's use of the word as a violation of the university's discriminatory harassment policy and recommended Dambrot be disciplined. Dambrot accepted the proposed disciplinary action in lieu of a more formal investigation and was suspended without pay for five days.

News of the locker room incident spread through the campus after Dambrot was suspended. An article in the student newspaper was printed in which Dambrot told his side of the story. The statement was characterized by the district court as "considerably more explanatory and defensive than apologetic in tone." *Dambrot*, 839 F.Supp. at 478. Students staged a demonstration and local, regional and national news media reported accounts of the incident at CMU.

On April 12, 1993, Keilitz, the athletic director, informed Dambrot he would not be retained as head coach for the 1993–94 season. The university stated that it believed Dambrot was no longer capable of effectively leading the men's basketball program.

Dambrot instituted a lawsuit on April 19, 1993, alleging, *inter alia*, he was fired because he used the term "nigger," and the termination violated his First Amendment rights to free speech and academic freedom. Several members of the basketball team joined the lawsuit alleging the university's discriminatory harassment policy was overbroad and vague and violated their First Amendment rights.

On June 17, 1993, the district court granted in part Plaintiffs' motion for preliminary injunction. The preliminary injunction enjoined the university from enforcing its discriminatory harassment policy. On July 16, 1993, Plaintiffs and Defendants moved for summary judgment. A motion hearing was held on September 21, 1993. Judge Robert H. Cleland rendered his decision in a written opinion and order on November 26, 1993. *Dambrot v. Central Mich. Univ.*, 839 F.Supp. 477 (E.D.Mich.1993). As was stated above, the district court granted Student Plaintiffs' motion for summary judgment holding the university's discriminatory harassment policy was facially unconstitutional. The district court also granted Defendants' motion for

summary judgment holding Dambrot was not wrongfully terminated.

Dambrot filed a notice of appeal on December 23, 1993. On December 27, 1993, Plaintiffs filed a motion for attorney's fees. On January 4, 1994, Defendants filed a notice of cross-appeal. On June 20, 1994, the district court granted Plaintiffs' motion for attorney's fees. Defendants appealed the grant of attorney's fees to Plaintiffs the same day.

## II. Discussion

Defendants appeal the district court's grant of summary judgment holding the CMU discriminatory harassment policy overbroad and void for vagueness violating the First Amendment. Plaintiffs appeal the district court's grant of summary judgment holding CMU's termination of Dambrot did not violate the First Amendment. Defendants also appeal the district court's award of attorney's fees to Plaintiffs. For the following reasons we AFFIRM the district court on each issue.

### A. The District Court Did Not Err in Granting Summary Judgment For Plaintiffs Finding the CMU Discriminatory Harassment Policy Unconstitutional.

#### 1. Standard of Review

■ This court reviews the grant of a motion for summary judgment *de novo. Faughender v. City of North Olmsted,* 927 F.2d 909, 911 (6th Cir.1991).

Summary judgment is proper if the moving party shows there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

#### 2. The Discriminatory Harassment Policy is Unconstitutional on its Face.

■ The overbreadth doctrine provides an exception to the traditional rules of standing and allows parties not yet affected by a statute to bring actions under the First Amendment based on a belief that a certain statute is so broad as to "chill" the exercise of free speech and expression. *Leonardson v. City of E. Lansing,* 896 F.2d 190, 195 (6th Cir.1990); *Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973). A statute is unconstitutional on its face on overbreadth grounds if there is "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the court...." *Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 801, 104 S.Ct. 2118, 2126, 80 L.Ed.2d 772 (1984).

■ The CMU policy, located in the Plan for Affirmative Action at Central Michigan University, states discriminatory harassment will not be condoned. Racial and ethnic harassment is defined in the policy as

any intentional, unintentional, physical, verbal, or nonverbal behavior that subjects an individual to an intimidating, hostile or offensive educational, employment or living environment by ... (c) demeaning or slurring individuals through ... written literature because of their racial or ethnic affiliation; or (d) using symbols, [epithets] or slogans that infer negative connotations about the individual's racial or ethnic affiliation.

Plan for Affirmative Action at Central Michigan University, Section III(b)(1), Racial and Ethnic Harassment. The first step in analyzing an overbreadth claim is to "determine whether the regulation reaches a substantial amount of constitutionally protected speech." *Id.* at 195. The language of this policy is sweeping and seemingly drafted to include as much and as many types of conduct as possible. On its face, the policy reaches "a substantial amount of constitutionally protected speech." *Id.*

CMU argues the policy does not present a "realistic danger" of compromising First Amendment rights because 1) there is no enforcement mechanism and 2) the university

enforces the policy with respect for First Amendment rights. Defendants' first argument is not persuasive. Although there are no formal mechanisms of enforcement, it is clear from the sanctions imposed on Dambrot that the university can pursue violations to the policy.

Secondly, CMU argues any concerns the policy will reach constitutionally protected speech have been abated by language in the policy which states:

> The University will not extend its application of discriminatory harassment so far as to interfere impermissibly with individuals rights to free speech.

In *Vittitow v. City of Upper Arlington,* 43 F.3d 1100 (6th Cir.1995), this Circuit declined to save an unconstitutional ordinance by accepting the representations of the City's counsel that the ordinance would be enforced in a particular way. Similarly, this court declines to accept the representations of CMU.

The University of Michigan made an argument similar to CMU's in *Doe v. University of Michigan,* 721 F.Supp. 852, 864 (E.D.Mich. 1989). In that case, the University of Michigan's anti-discrimination policy was struck down as constitutionally overbroad.[5] The court noted that "[t]he University repeatedly argued that the Policy did not apply to speech that is protected by the First Amendment." *Id.* The policy, however, was held to be both invalid on its face and had been applied in a manner which violated the First Amendment.

In the instant case, there is nothing to ensure the University will not violate First Amendment rights even if that is not their intention. It is clear from the text of the policy that language or writing, intentional or unintentional, regardless of political value, can be prohibited upon the initiative of the university. The broad scope of the policy's language presents a "realistic danger" the University could compromise the protection afforded by the First Amendment.

The district court decision in *Doe* noted:

> [T]he University may subject all speech and conduct to reasonable and non-discriminatory time, place, and manner restrictions which are narrowly tailored and which leave open ample alternative means of communication.
>
> What the University could not do, however, was establish an anti-discrimination policy which had the effect of prohibiting certain speech because it disagreed with ideas or messages sought to be conveyed.... Nor could the University proscribe speech simply because it was found to be offensive, even gravely so, by large numbers of people.

*Id.,* at 863 (citations omitted).

On its face, the CMU discriminatory harassment policy "sweeps within its ambit both constitutionally protected activity ... and unprotected conduct, making it subject to an overbreadth challenge." *Leonardson,* 896 F.2d at 195.

 The next step in analyzing an overbreadth claim is to determine whether the policy is "substantially overbroad and constitutionally invalid under the void for vagueness doctrine." *Leonardson,* 896 F.2d at 195–96.

Vagueness may take two forms, both of which result in a denial of due process. A vague ordinance denies fair notice of the standard of conduct to which a citizen is held accountable. At the same time an ordinance is void for vagueness if it is an

---

**5.** The University of Michigan policy assessed disciplinary action for certain conduct. The policy provided, in part, sanctions for:

1. Any behavior, verbal or physical, that stigmatizes or victimizes an individual on the basis of race, ethnicity, religion, sex, sexual orientation, creed, national origin, ancestry, age, marital status, handicap or Vietnam-era veteran status and that

 a. Involves an express or implied threat to an individual's academic efforts, employment, participation in University sponsored extra-curricular activities or personal safety; or

 b. Has the purpose or reasonably foreseeable effect of interfering with an individual's academic efforts, employment, participation in University sponsored extracurricular activities or personal safety; or

 c. Creates an intimidating, hostile, or demeaning environment for educational pursuits, employment or participation in University sponsored extra-curricular activities....

unrestricted delegation of power, which in practice leaves the definition of its terms to law enforcement officers, and thereby invites arbitrary, discriminatory and over-zealous enforcement.

*Id.* (citing *Washington Mobilization Comm. v. Cullinane,* 566 F.2d 107 (D.C.Cir.1977)). As the district court notes "[i]n the instant case, both problems—fair notice, and unrestricted delegation—are present." *Dambrot,* 839 F.Supp. at 484. In order to determine what conduct will be considered "negative" or "offensive" by the university, one must make a subjective reference. Though some statements might be seen as universally offensive, different people find different things offensive. The facts of this case demonstrate the necessity of subjective reference in identifying prohibited speech under the policy. Several players testified they were not offended by Dambrot's use of the N-word while student Norris and affirmative action officer Haddad were extremely offended. The CMU policy, as written, does not provide fair notice of what speech will violate the policy. Defining what is offensive is, in fact, wholly delegated to university officials. This "unrestricted delegation of power" gives rise to the second type of vagueness. For these reasons, the CMU policy is also void for vagueness.

### 3. Even if the N-word Constitutes a "Fighting Word," the Discriminatory Harassment Policy Remains Unconstitutional.

■ Defendant CMU argues the policy is a prohibition of "fighting words." Assuming, *arguendo,* CMU is correct, the policy is still constitutionally prohibited. *R.A.V. v. St. Paul,* 505 U.S. ——, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). In *R.A. V.,* the petitioner and other teenagers allegedly erected and burned a cross inside the fenced yard of a Black family. The City of St. Paul brought suit under the St. Paul Bias Motivated Crime Ordinance, St. Paul, Minn.Legis.Code § 292.02 (1990).[6] The Supreme Court held

the First Amendment does not allow the imposition of "special prohibitions on those speakers who express views on disfavored subjects." *Id.* at ——, 112 S.Ct. at 2548. The ordinance was found to contain limitations on content and viewpoint which rendered it facially unconstitutional. The Court held:

> Although the [ordinance has been limited] to reach only those symbols or displays that amount to "fighting words," the remaining, unmodified terms make clear that the ordinance applies only to "fighting words" that insult, or provoke violence, "on the basis of race, color, creed, religion or gender." Displays containing abusive invective, no matter how vicious or severe, are permissible unless they are addressed to one of the specified disfavored topics. Those who wish to use "fighting words" in connection with other ideas—to express hostility, for example, on the basis of political affiliation, union membership, or homosexuality—are not covered.

*Id.,* at —— —— ——, 112 S. Ct. at 2547–48. CMU's policy prohibits "written literature, ... symbols, [epithets] or slogans that infer negative connotations *about the individual's racial or ethnic affiliation.*" Under *R.A.V.,* the CMU policy constitutes content discrimination because it necessarily requires the university to assess the racial or ethnic content of the speech.

*R.A.V.* also held the St. Paul ordinance constituted viewpoint discrimination because it prohibited fighting words used against persons because of their racial or ethnic affiliation but did not prohibit fighting words which could be hurled in response to a race or ethnic-based attack, even if the fighting words were the same. *See id.* The ability to use certain words depended on the identity and affiliation of the speaker. This impermissible viewpoint discrimination could easily occur under the CMU policy as the identity of the speaker and the target are important

---

**6.** The ordinance stated:

Whoever places on public or private property a symbol, object, appellation, characterization or graffiti, including but not limited to, a burning cross or Nazi swastika, which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender commits disorderly conduct and shall be guilty of a misdemeanor.

in determining whether there has been a violation.

Because the CMU discriminatory harassment policy is overbroad and void for vagueness and because it is not a valid prohibition against fighting words, the CMU discriminatory harassment policy violates the First Amendment of the United States Constitution. The district court's grant of summary judgment in favor of Plaintiffs on this issue is therefore **AFFIRMED.**

**B. The District Court Did Not Err in Finding Dambrot Was Permissibly Terminated.**

Dambrot seeks relief from an alleged wrongful termination for the following reasons stated in his amended complaint:

20. Plaintiff's communication with his players is speech protected by the First Amendment.

21. Plaintiff Dambrot's use of the term "nigger" in the sense set forth above in the instructional context is fully protected by the First Amendment.

22. The Defendants, acting under color of state law, terminated Plaintiff's employment, solely because of his exercise of expression fully protected by the First Amendment.

JA at 30. The district court described Dambrot's argument, as stated in the briefs and oral argument, this way: (1) CMU's policy is unconstitutional because it suppresses speech that is protected by the First Amendment; (2) Plaintiff Dambrot was sanctioned pursuant to the policy and eventually terminated from employment as a result of such sanctioning; (3) therefore, plaintiff's termination was violative of the First Amendment. *Dambrot*, 839 F.Supp. at 485. The district court correctly noted while Dambrot's argument has a seductive logic, Dambrot can only demonstrate harm resulted from the application of the invalid policy if his speech was in fact protected. Without a finding that Dambrot's speech is protected under the First Amendment, the application of the policy does not injure Dambrot. Without the demonstration of some harm, Dambrot cannot recover.

The other argument intimated by Dambrot in # 21 of his complaint is that he is protected under the concept of academic freedom. From either perspective, the central issue is whether Dambrot's speech is protected by the First Amendment. We find it is not.

**1. CMU's Termination of Dambrot was Permissible Because Dambrot's Speech Does Not Touch a Matter of Public Concern.**

The Supreme Court has held a government employee retains her First Amendment right to comment on matters of public concern without fear of reprisal from the government as employer. *Connick v. Myers*, 461 U.S. 138, 140, 103 S.Ct. 1684, 1686, 75 L.Ed.2d 708 (1983) (citing *Pickering v. Board of Education*, 391 U.S. 563, 574, 88 S.Ct. 1731, 1737–38, 20 L.Ed.2d 811 (1968) (teacher's comments regarding whether school system required additional funds touched upon a matter of public concern and could not provide basis for dismissal)); *see also, Matulin v. Village of Lodi*, 862 F.2d 609, 612 (6th Cir.1988) ("It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech.") (quoting *Rankin v. McPherson*, 483 U.S. 378, 383, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987) (public employee's statement's regarding shooting of President Reagan touched on matter of public concern)). Moreover, an employee's untenured status will not defeat constitutional claims. *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (untenured junior college professor entitled to hearing on issue of whether nonrenewal of his contract violated free speech rights under First Amendment).

The *Pickering* Court developed a balancing test which weighed "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.*, at 568, 88 S.Ct. at 1734–35 (cited in *Connick*, 461 U.S. at 140, 103 S.Ct. at 1686). Prior to *Connick*, courts applied the *Pickering* balance test when determining whether the government's disci-

pline or termination of a public employee violated the First Amendment. *See e.g., Stern v. Shouldice,* 706 F.2d 742 (6th Cir.), *cert. denied,* 464 U.S. 993, 104 S.Ct. 487, 78 L.Ed.2d 683 (1983) (non-tenured professor's advice to student to seek legal advice about suspension protected under First Amendment); *Hildebrand v. Board of Trustees of Michigan State ·Univ.,* 662 F.2d 439 (6th Cir.1981), *cert. denied,* 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 168 (1982) (professor's tenure denial based, in part, on professor's protected speech did not provide cause of action where he would have been denied tenure regardless of protected activities); *Anderson v. Evans,* 660 F.2d 153 (6th Cir. 1981) (interest of school board in maintaining efficient, regularly functioning school system and employing effective teachers outweighed interest of tenured teacher in making remarks reflecting her attitude about Black persons).

■■■■ In *Connick,* the Supreme Court incorporated the *Pickering* test into a two step analysis for determining when the discharge of a public employee violates the First Amendment.[7] *Id., see also, Matulin, supra.* "The threshold question . . . is whether [the employee's] speech may be 'fairly characterized as constituting speech on a matter of public concern.'" *Matulin,* 862 F.2d at 612 (quoting *Rankin,* 483 U.S. at 384, 107 S.Ct. at 2897 (quoting *Connick,* 461 U.S. at 146, 103 S.Ct. at 1689)). Second, if the speech is found to touch upon a matter of public concern, the court must then apply the *Pickering* balancing test. If the employee's free speech interests outweigh the efficiency interests of the government as employer, the employee's First Amendment rights have been violated.

■■■ If the First Amendment violation was a substantial or motivating factor in the termination, the employer may present evidence the employee would have been terminated in the absence of protected conduct. *See Mt. Healthy City Sch. Dist. Board of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (where untenured teacher was not rehired based in substantial part on protected conduct, proper inquiry was whether school district would have reached the same decision in the absence of the protected conduct); *Matulin,* 862 F.2d at 613.

Defendants assert there were reasons other than Dambrot's speech for terminating his employment. The *Connick* court noted, however, "if [the speech] cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for us to scrutinize the reason for [the] discharge." *Id.* Thus, if Dambrot's speech is not a matter of public concern, the court's inquiry ends.

■■■ The question of whether speech touches upon a matter of public concern is one of law, to be reviewed *de novo. Rahn,* 31 F.3d at 411; *Barnes,* 848 F.2d at 733.

The *Connick* court describes speech upon matters of public concern as "relating to any matter of political, social, or other concern to the community." *Id.,* at 146, 103 S.Ct. at 1690. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.,* at 147–48, 103 S.Ct. at 1690. This Circuit has applied the *Connick* test in several areas, none, however, similar to the facts of the instant case.[8]

---

7. In *Connick,* a former assistant district attorney brought a civil rights action alleging she was impermissibly terminated for circulating a questionnaire after a decision was made by a superior to transfer her to a different section of criminal court. The Supreme Court found one of the matters—whether employees felt pressured to work in political campaigns—was a matter of public concern but the interests of her employer in "the effective and efficient fulfillment of its responsibilities to the public" outweighed any harm to the Plaintiff.

8. *See e.g., Rahn v. Drake Ctr.,* 31 F.3d 407 (6th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2578, 132 L.Ed.2d 828 (1995) (statements made in press release attacking use of funds from recent tax levy benefiting Drake Center and conversion of 75% of hospital beds to private status did not touch matters of public concern); *Williams v. Kentucky,* 24 F.3d 1526 (6th Cir.) *cert. denied,* —— U.S. ——, 115 S.Ct. 358, 130 L.Ed.2d 312 (1994) (public employee's statements critical of political patronage practices and suspected political involvement by DES office were matters of public concern); *Thomson v.*

■ The Seventh Circuit offers a particularly instructive explanation of the *Connick* test in *Linhart v. Glatfelter,* 771 F.2d 1004 (7th Cir.1985) (holding former police chief's expressions of personal opinion regarding competency of Village Manager were not protected by First Amendment). The *Linhart* court described the proper inquiry as not "what might incidentally be conveyed by the fact that the employee spoke in a certain way, [but] the *point* of the speech in question." *Id.,* at 1010. The court must ask to what purpose the employee spoke. Controversial parts of speech advancing only private interests do not necessarily invoke First Amendment protection.

The Fifth Circuit focused on the intent of the speech in question in *Martin v. Parrish,* 805 F.2d 583 (5th Cir.1986). Plaintiff Martin had been discharged for incessant use of profanity in his college classroom. He denigrated his students' ability because they were accustomed to part-time, allegedly less rigorous, instructors at another college. The Fifth Circuit held his speech did not touch a matter of public concern because the profanity used by Martin served only to reflect his attitude toward his students. The court noted "Appellant has not argued that his profanity was for any purpose other than cussing out his students as an expression of frustration with their progress—to 'motivate' them—and has thereby impliedly conceded his case under *Connick.*" *Martin,* 805 F.2d at 585.

■ Focusing on the "content, form and context" of Dambrot's use of the word "nigger," this Court can find nothing "relating to any matter of political, social or other concern to the community." Dambrot's locker room speech imparted no socially or politically relevant message to his players. The *point* of his speech was not related to his use of the N-word but to his desire to have his players play harder. Like the use of profanity in *Martin,* Dambrot's use of the N-word was intended to be motivational and was incidental to the message conveyed. As the district court discussed:

> [T]he coach was intending to be motivational and ... thought he was permitted through circumstances or by specific agreement of the players to make use of such language in the locker room. The Court further assumes the truth of Dambrot's assertion that he was attempting to flatter some players by applying the term to them as they often did to themselves in his presence. He thought he would humiliate (or motivate) others by *withholding* the description from them (or by referring to them as only "half-nigger"). In these ways he was using their "street language" as shorthand to call their attention to enthusiasm and toughness on the basketball floor, or to their lack of it.

A coach's distress about the degree of aggressiveness shown by his players on the basketball court is a reasonable matter of concern, certainly, to the coach, but not

---

*Scheid,* 977 F.2d 1017, 1021 (6th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2341, 124 L.Ed.2d 251 (1993) (conversation concerning proper procedure in fraud investigation was matter of "internal department policy and [could not] be considered speaking out on matters of public concern."); *Boger v. Wayne County,* 950 F.2d 316 (6th Cir.1991) (petitioner's response to newspaper reporter's inquiry about charges of racial discrimination addressed matter of public concern); *Meyers v. City of Cincinnati,* 934 F.2d 726 (6th Cir.1991) (statements regarding method of implementing affirmative action were matters of public concern); *Langford v. Lane,* 921 F.2d 677 (6th Cir.1991) (statements in dispute over office policy not matters of public concern but statements at public hearing regarding office policy were matters of public concern); *Brown v. City of Trenton,* 867 F.2d 318 (6th Cir.1989) (patrolman's letter complaining about superior's policy decisions did not touch matter of public

concern); *Matulin, supra,* (public employees statements in solicited newspaper interview discussing racial and retaliatory harassment at workplace were matters of public concern); *Barnes v. McDowell,* 848 F.2d 725 (6th Cir.1988), *cert. denied,* 488 U.S. 1007, 109 S.Ct. 789, 102 L.Ed.2d 780 (1989) (public employee's allegations of corruption were not genuine and as such did not touch upon matter of public concern); *Solomon v. Royal Oak Township,* 842 F.2d 862, 865 (6th Cir.1988) ("speech disclosing public corruption is a matter of public interest"); *McMurphy v. City of Flushing,* 802 F.2d 191 (6th Cir.1986) (certain remarks made out of spite by police officer were insubordination and did not touch upon matter of public concern); *Marohnic v. Walker,* 800 F.2d 613 (6th Cir.1986) (statements regarding operation of public organizations in accordance with law are matters of public concern). For an overview of other circuits determinations of various matters of public concern, *see Dambrot,* 839 F.Supp. at 486 n. 13.

the kind of question that is fairly cast as a "public" issue.

*Dambrot,* 839 F.Supp. at 487.

The district court constructs an interesting and useful test for assessing under *Connick* the "form and context" of Dambrot's speech.

[O]ne way to evaluate the possibility of the "public concern" component in questioned speech is to imagine it being discussed in public. The political compulsion of public employees partially at issue in *Connick, supra,* the allegations of corruption noted in *McMurphy, supra,* and comments concerning the level of fire protection in a town discussed in *Brasslett v. Cota,* 761 F.2d 827 (1st Cir.1985), all can easily be envisioned as the subjects of heated disputation, with the contesting points of view hashing it out from soapboxes in the public square. It is considerably more difficult to imagine Coach Dambrot stepping up to the microphone and letting everyone know that his basketball players were expected to be "niggers" during games. [footnote omitted] Therefore, the facts that Dambrot's speech was given in the particular words chosen, and made in the locker room for his players' private consumption, only add further support to the conclusion that, at least to the "form and context" of it, his speech was not on a matter of public concern. [citations omitted].

This hypothetical exercise illustrates well how context can provide insight as to intent. In applying the *Connick* test assessing "content, form and context," the essence of the inquiry is how each of these indicators clarifies the communicative purpose of the speaker. The fact Dambrot was in a locker room rather than a stadium is not determinative of the public nature of the speech. *See, Dambrot,* 839 F.Supp. at 487; *Givhan v. Western Line Consol. Sch. Dist.,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). It does, however, support the conclusion Dambrot did not intend to speak on a matter of public concern.

## 2. Dambrot's Speech Does Not Enter the Marketplace of Ideas Or the Realm of Academic Freedom.

Dambrot argues *Connick* is not applicable to his claim but instead the court should recognize his constitutionally protected right to academic freedom because he "was terminated because of the purported 'public outcry' that arose over what he said to his players, *when he was instructing them about how they should be playing basketball and about how they should behave in the classroom.*"

The analysis of what constitutes a matter of public concern and what raises academic freedom concerns is of essentially the same character. In *Swank v. Smart,* 898 F.2d 1247, 1250 (7th Cir.1990), a police officer was terminated from his employment based on a coworker's report that he picked up a young college student and gave her a ride on the back of his motorcycle. During the ride the officer and the student talked about numerous topics including her coursework, the motorcycle and her former boyfriend. After his dismissal the officer sued the town alleging, *inter alia,* the termination had violated his free speech rights guaranteed by the First Amendment. The Seventh Circuit held that conversations between the police officer and the young woman did not touch a matter of public concern and merited no First Amendment protection. Judge Posner recognized

[t]he purpose of the free-speech clause ... is to protect the market in ideas, broadly understood as the public expression of ideas, narratives, concepts, imagery, opinions—scientific, political, or aesthetic—to an audience whom the speaker seeks to inform, edify, or entertain. Casual chit-chat between two persons or otherwise confined to a small social group is unrelated, or largely so, to that marketplace, and is not protected. Such conversation is important to its participants but not to the advancement of knowledge, the transformation of taste, political change, cultural expression, and the other objectives, values and consequences of the speech that is protected by the First Amendment.

*Id.*

The principle of academic freedom emphasizes the essentiality of free public expression of ideas. In *Keyishian v. Board of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 683,

17 L.Ed.2d 629 (1967), the Supreme Court recognized

> [t]he classroom is peculiarly the "marketplace of ideas." The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth "out of a multitude of tongues, [rather] than through any kind of authoritative selection."

The linchpin of the inquiry is, thus, for both public concern and academic freedom, the extent to which the speech advances an idea transcending personal interest or opinion which impacts our social and/or political lives.

■ Compare with the instant case two cases out of the Second Circuit involving the First Amendment rights of two professors from the City University of New York (CUNY). See *Levin v. Harleston*, 966 F.2d 85 (2d Cir.1992); *Jeffries v. Harleston*, 21 F.3d 1238 (2d Cir.1994), *vacated, remanded*, — U.S. —, 115 S.Ct. 502, 130 L.Ed.2d 411 (1994).[9] In both cases, professors made derogatory remarks about persons of certain racial or ethnic groups and, in both cases, the University took some action which the professor alleged was in retaliation for the exercise of his First Amendment rights. Professor Levin wrote three letters which were published in the New York Times and two journals in which he made denigrating comments about the intelligence of African Americans. The University created a "shadow section" for one of Levin's classes and set up an Ad Hoc Committee to review his fitness to teach. Professor Jeffries made a speech in which he discussed racial bias in the New York public school system and made derogatory comments about Jews. In his case, the University denied Jeffries a three-year term as chairman of the Black Studies department, the post he had held since the department's inception in 1972. In *Levin*, the Second Circuit found Professor Levin's expression of ideas demanded First Amendment protection. *Levin*, 966 F.2d at 87. In *Jeffries*, the Second Circuit found the speech in question satisfied the first prong of the *Connick* test, touching a matter of public concern. *Jeffries*, 21 F.3d at 1245. The speech and letters advanced viewpoints, however repugnant, which had as their purpose influencing or informing the public debate. Dambrot's speech did not have such a purpose.

Likening himself to the professor in *Parate v. Isibor*, 868 F.2d 821 (6th Cir.1989), Dambrot attempts to bring himself under the protection of academic freedom. Professor Parate, a native of India, was forced to change the grade of a Nigerian student at the insistence of the Dean of the School of Engineering & Technology at Tennessee State University, also a native Nigerian. This Circuit held the action of the Dean forcing Parate to change the grade, rather than the school changing it, constituted a violation of Parate's right to free speech. "Because the assignment of a letter grade is symbolic communication intended to send a specific message to the student, the individual professor's communicative act is entitled to some measure of protection." *Id.*, at 827.

---

**9.** The Second Circuit held Jeffries's speech was protected based on the jury's findings that CUNY would not have removed Jeffries from his position as chairman of the Black Studies department but for his speech. The judgment was remanded to the United States Court of Appeals for the Second Circuit for further consideration in light of *Waters v. Churchill*, 511 U.S. —, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994). In *Waters*, a plurality of the Supreme Court held the *Connick* test should be applied to what the government reasonably thought was said, i.e. the government should not be held to the same evidentiary standards used by a jury when making its decision whether or not to terminate an employee based on what is thought to be unprotected speech. The Court further concluded "where the government is acting as employer, its efficiency concerns should ... be assigned a greater value."

*Id.* at —, 114 S.Ct. at 1888. This inquiry, of course, occurs after the speech has been found to touch a matter of public concern.

The Second Circuit reconsidered its decision under *Waters* in *Jeffries v. Harleston*, 52 F.3d 9 (2d Cir. (N.Y.)). The court construed the *Waters* court to hold "that the closer the employee's speech reflects on matters of public concern, the greater must be the employer's showing that the speech is likely to be disruptive before it may be punished." *Jeffries*, 52 F.3d at 13. Finding, as a matter of law, that the potential disruptiveness of Jeffries speech outweighed whatever First Amendment value the speech might have had, the Second Circuit, reversed the district court's decision to reinstate Jeffries and remanded with instructions to enter judgment for the defendants.

Dambrot's use of the N-word, unlike Parate's grade, was not the essence of his communicative act. While Professor Parate's specific message to the student by issuing a grade was that he deserved a "B," Dambrot's message was that his players needed to play harder, not that "niggers" are "fearless, mentally strong and tough" but out of place in the classroom.

Dambrot's use of the N-word is even further away from the marketplace of ideas and the concept of academic freedom because his position as coach is somewhat different from that of the average classroom teacher. Unlike the classroom teacher whose primary role is to guide students through the discussion and debate of various viewpoints in a particular discipline, Dambrot's role as a coach is to train his student athletes how to win on the court. The plays and strategies are seldom up for debate. Execution of the coach's will is paramount. Moreover, the coach controls who plays and for how long, placing a disincentive on any debate with the coach's ideas which might have taken place.

While Dambrot argues and we accept as true that he intended to use the term in a positive and reinforcing manner, Dambrot's total message to the players is disturbing. Corey Henderson, one of the players on the 1992–93 team touched on the concern in his deposition testimony.

Q What did that phrasing that he had wanted you to play like niggers on the basketball floor but not be niggers in the classroom mean to you as a student? [sic]

A I really am not sure. Because in the context he was trying to use it in, I mean, nigger I guess as a—he wanted us—I guess he wanted us to play harder, I suppose, and I didn't understand why if it was good enough on the court then why it wasn't good enough in the classroom.

I mean, I was kind of shocked that he used that word being a coach and all because he—I didn't think that was appropriate for him to use that word, him or any coach, talking to a group of mostly young adult black males. I didn't think it was right for him to use that word.

But then I was kind of disgusted when he said not being one in the classroom. I didn't understand why it was good enough on the court but not good enough in the classroom.

The First Amendment protects the right of any person to espouse the view that a "nigger" is someone who is aggressive in nature, tough, loud, abrasive, hard-nosed and intimidating; someone at home on the court but out of place in a classroom setting where discipline, focus, intelligence and interest are required. This same view has been and is held about African Americans by many who view the success of Black athletes as a result of natural athletic ability and the success of Black executives as the result of affirmative action.

What the First Amendment does not do, however, is require the government as employer or the university as educator to accept this view as a valid means of motivating players. An instructor's choice of teaching methods does not rise to the level of protected expression. *Hetrick v. Martin*, 480 F.2d 705, 708–9 (6th Cir.), *cert. denied*, 414 U.S. 1075, 94 S.Ct. 592, 38 L.Ed.2d 482 (1973) (university's nonrenewal of untenured teacher based on her teaching style did not violate constitutional rights to academic freedom and freedom of speech). Assuming but not deciding, Dambrot is subject to the same standards as any teacher in a classroom (as opposed to a locker room setting), Dambrot's speech served to advance no academic message and is solely a method by which he attempted to motivate—or humiliate—his players. In the instant case, the University has a right to terminate Dambrot for recklessly telling these young men to be athletically ardent but academically apathetic in his attempt to boost athletic performance. The University has a right to terminate Dambrot for telling his players that success on the basketball court is not premised on the same principles of discipline, focus and drive that bring success in the classroom. The University has a right to disapprove of the use of the word "nigger" as a motivational tool just as the college in *Martin* was not forced to

tolerate profanity. Finally, the University has a right to hold Coach Dambrot to a higher standard of conduct than that of his players. Dambrot's resort to the First Amendment for protection is not well taken.

For the foregoing reasons, Dambrot's speech cannot be fairly characterized as touching a matter of public concern. Thus, there is no need to reach the *Pickering* balancing of government efficiency interests and the employee's interest in expression. Moreover, there is no need to reach the question of whether the speech was the primary reason for the termination or whether CMU had other reasons for terminating Dambrot. Neither does Dambrot's speech raise any academic freedom concerns. Accordingly, the district court's grant of summary judgment for CMU on this issue is **AFFIRMED.**

## C. The District Court Did Not Err in its Decision to Grant Attorney's Fees.

Plaintiffs sought and were granted attorney's fees pursuant to the Civil Rights Attorney's Fees Award Act of 1976, 42 U.S.C. § 1988 (1976 ed., Supp V). Defendants oppose the district court's award of fees on three grounds: 1) plaintiffs are not prevailing parties; 2) the district court should have reduced the total amount of recovery to reflect non-meritorious claims and duplicated efforts.

### 1. The District Court Did Not Err in Finding Plaintiffs Are Prevailing Parties.

■ The award of attorney's fees is reviewed for abuse of discretion. *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983); *Louisville Black Police Officers Org., Inc. v. City of Louisville,* 700 F.2d 268, 273–74 (6th Cir.1983). *See also, Scales v. J.C. Bradford & Co.,* 925 F.2d 901, 909 (6th Cir.1991).

■ Defendants argue Plaintiffs are not properly considered prevailing parties. In *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.,* 489 U.S. 782, 792–93, 109 S.Ct. 1486, 1494, 103 L.Ed.2d 866 (1989), the Supreme Court held "[t]he touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute." Defendants argue there has been no "material alteration of the legal relationship of the parties" and that Plaintiffs' victory on the unconstitutionality of the CMU policy is *de minimis.*

In *Garland,* a teachers' association had challenged the school board's policy limiting communications with teachers relating to employee organization. The Supreme Court had affirmed the Fifth Circuit's judgment finding the limitations on teacher communications as well as the limitation on the employee organization's use of school facilities were unconstitutional. *See Garland Indep. Sch. Dist. v. Texas State Teachers Ass'n,* 479 U.S. 801, 107 S.Ct. 41, 93 L.Ed.2d 4 (1986). The subsequent application for attorney's fees was denied by the district court and the Fifth Circuit which held the plaintiffs were not prevailing parties. The Supreme Court reversed the Fifth Circuit and found plaintiffs were prevailing parties within the meaning of 42 U.S.C. § 1988. The Court noted:

For example, in the context of this litigation, the District Court found that the requirement that nonschool hour meetings be conducted only with prior approval from the local school principal was unconstitutionally vague ... The District Court characterized this issue as "of minor significance" and noted that there was "no evidence that the plaintiffs were ever refused permission to use school premises during non-school hours." ... If this had been petitioners' only success in the litigation, we think it clear that this alone would not have rendered them "prevailing parties" within the meaning of § 1988. Where the plaintiff's success on a legal claim can be characterized as purely technical or *de minimis,* a district court would be justified in concluding that even the "generous formulation" we adopt today has not been satisfied.

*Garland,* 489 U.S. at 792, 109 S.Ct. 1486. In the context of a case seeking to prevent limitations placed on teachers' attempts to organize, the invalidation of a rule limiting use of school facilities can be said to be minor. In the instant case, however, Plain-

tiff's success cannot be termed purely technical or *de minimis*. The main issue in this case was the constitutionality of Dambrot's speech and the university's permissible restrictions on that speech.

Defendants argue because the discriminatory harassment policy had never been enforced, Plaintiffs experience no real benefit from the judgment. However, the lack of enforcement of the facilities use limitation in *Garland* was not the only factor which made it *de minimis*. The nature of that victory was also only tangentially related to the primary victory on teachers' rights to communicate regarding employee organizations.

Defendants further argue Plaintiffs do not meet the Supreme Court's recent restatement of the prevailing party standard in *Farrar v. Hobby*, — U.S. —, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992).

> "In short, a plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff."

*Id.* at —, 113 S.Ct. at 573. In *Farrar*, plaintiffs sued the Lieutenant Governor of Texas for alleged due process violations after the Governor participated in closing down the Correctional School for Adolescents owned and operated by the plaintiffs. Plaintiffs requested $17 million but received a one dollar nominal judgment. The district court awarded $280,000 in fees. The Supreme Court upheld the Fifth Circuit's reversal of the fee award, citing the "technical" and "insignificant" nature of the victory. Defendants argue Plaintiffs are not prevailing parties because they do not benefit materially from the judgment that the CMU discriminatory harassment policy is unconstitutional. There is, however, a vast difference between a case where no meaningful recovery was had against the Lieutenant Governor and a case where the recovery sought and achieved is the right to speak freely. Although the Defendants argue their behavior has not been modified, their distinction is one between positive and negative action. Where Defendants previously had the right to prohibit Plaintiff's speech, now they do not.

In *Citizens Against Tax Waste v. Westerville City School Dist. Bd. of Educ.*, 985 F.2d 255 (6th Cir.1993), an "unincorporated association of property owners" sought to enjoin the enforcement of a policy adopted by the Board of Education which required persons in the same position as plaintiffs "to obtain prior approval from the [Board] President ... before speaking." *Id.* at 256. In response to the plaintiffs' lawsuit the Board revised its policy after having agreed to "defer implementation of the alleged policy pending a hearing." *Id.* Though the objectionable policy was never enforced, this Circuit held the plaintiffs

> accomplished some significant relief or benefit sought.... Since plaintiffs have attained "at least some relief on the merits of [its] claim," CATW should be deemed a prevailing party. *Hewitt v. Helms*, 482 U.S. 755, 760, 107 S.Ct. 2672, 2675, 96 L.Ed.2d 654 (1987). We also deem this relief or benefit to have changed, to some extent, the preexisting "legal relationship" between the parties. *See Garland*, 489 U.S. at 792, 109 S.Ct. at 1493. The question to answer in plaintiffs' quest for fees is whether plaintiffs have accomplished a "material alteration of the legal relationship of the parties." *Farrar v. Hobby*, — U.S. —, —, 113 S.Ct. 566, 572, 121 L.Ed.2d 494 (1992) [citation omitted].

*Id.* at 258. The vindication of rights under the First and Fourteenth Amendments, whether or not such rights had been infringed upon, constitutes relief such that Plaintiffs should be deemed prevailing parties. Thus, the district court's finding that Plaintiffs are prevailing parties is **AFFIRMED**.

**2. The District Court Did Not Abuse Its Discretion By Declining to Reduce the Fee Award to Reflect Nonmeritorious or Unsuccessful Claims or Duplicated Efforts.**

■ Defendants state in their brief "[t]he district court is simply cautioned to 'make clear that it has considered the relationship between the amount of the fee awarded and the results obtained.'" Defendants' brief at 12, n. 11 (citing *Hensley*, 461 U.S. at 436–37,

103 S.Ct. at 1941). The district court stated the following in making its fee determination:

> As noted earlier, plaintiff's overall success is the most salient factor in the instant civil rights litigation. *Farrar* [— U.S. at ——, 113 S.Ct. at 574–75], 121 L.Ed.2d at 505. Here, the plaintiffs have been altogether successful in vindicating the first amendment rights of plaintiffs and future plaintiffs and all those in an equivalent position. However, as stated earlier, since plaintiff Dambrot's claim of wrongful discharge was not successful, and could not have affected the legal relationship between plaintiff Dambrot and defendants, no fees may be recovered based on that claim.
>
> However, the court also notes that [in] this case there is a commonality among the claims. Plaintiff Dambrot's argument was that the policy violated the first amendment, Dambrot was terminated for speech which violated the policy; therefore, Dambrot's termination was vindicated by the first amendment. From the plaintiffs' perspective, the claims were not only common but practically coextensive. From the court's perspective, the analysis involved in Count II (wrongful discharge of public employee), was largely distinct from the facial challenge of the policy under the First Amendment. Therefore, it could be argued that plaintiff's fees should be reduced because counts I and II required divergent analyses and plaintiffs succeeded with respect to and are eligible for recovery of fees only as to Count I. On the other hand, plaintiff's actual time spent may well be consistent with or nearly consistent with time spent on Count I.
>
> Where commonality is present, 'the district court should focus on the significance of the overall relief obtained by plaintiff in relation to the hours reasonably expected in the litigation.' Limited success may justify the reduction of the overall amount, but the court may not reduce the initial figure by 'comparing the total number of issues in the case with those actually prevailed upon.'

*Phelan v. Bell,* 8 F.3d 369, 374 (6th Cir. 1993).

* * * *

> In balancing some of the other factors against [Plaintiff's] limited success, ... the court finds that the complexity and undesirability of the case is as strong as the success was limited, i.e. the amount of time spent on Count II is comparable to the complexity of the issue in Count I. There need not be any adjustment upward or downward as the competing factors effectively cancel each other out.

*Dambrot v. Central Michigan Univ.,* No. 93–CV–10117–BC, slip op. at 10–11 (E.D.Mich. filed June 20, 1994). The district court, held to an abuse of discretion standard of review, has fulfilled its obligation under *Hensley* and *Farrar* with the above discussion.

### III. Conclusion

For the foregoing reasons, we **AFFIRM** the grant of summary judgment in favor of Plaintiffs finding the CMU discriminatory harassment policy violates the First Amendment, we **AFFIRM** the grant of summary judgment in favor of Defendants finding CMU's termination of Coach Dambrot's employment does not violate the First Amendment, and we **AFFIRM** the award of attorney's fees by the Honorable Robert H. Cleland of the United States District Court for the Eastern District of Michigan, Northern Division.