Charles W. **WRIGHT**, Plaintiff,

v.

The **GLYNN COUNTY BOARD OF COMMISSIONERS**, the governing body of Glynn County, a political subdivision of the State of Georgia, Defendant.

No. CV295–95.

United States District Court,
S.D. Georgia,
Brunswick Division.

April 30, 1996.

Walter Douglas Adams, Brunswick, GA, for Plaintiff.

Terry Lee Readdick, Richard K. Strickland, Whelchel, Brown, Readdick & Bumgartner, Brunswick, GA, for Defendant.

## ORDER

ALAIMO, District Judge.

Plaintiff, Charles W. Wright, brings the current action seeking damages under 42 U.S.C. § 1983 for violations of his free speech and due process rights secured by the First and Fourteenth Amendments to the United States Constitution. Wright is also bringing a claim under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et. seq.* Presently before the Court are two motions for summary judgment filed in accordance with Rule 56 of the Federal Rules of Civil Procedure. One motion and response have been filed by each party in this litigation. For the reasons stated below, Defendant's motion will be **GRANTED in PART and DENIED in PART.** Plaintiff's motion will be **DENIED.**

### FACTS

Charles W. Wright, a Caucasian, is a former employee of Glynn County, Georgia, who worked at the county landfill. In February of 1992, Wright stated to a black co-worker, Dorothy Sullivan, "Dorothy, for $280,000, they can call me a nigger three times a day." Ms. Sullivan complained to superiors about Wright's use of racial epithets. As a result of his language, Wright received a verbal reprimand which was documented in his personnel file.

Wright received a second reprimand in October of 1993. The reprimand stated that Wright was being disciplined for referring to a landfill patron as a "nigger" over the landfill radio. Wright denies this incident and claims that he used the word, "digger." However, it is undisputed that he did not appeal the reprimand.

On December 1, 1993, in reference to Ms. Sullivan, Wright stated to his supervisor, "When are you going to stop covering for that little nigger?" On December 10, in response to his comments, Becky Rowell, the head of the Solid Waste Disposal Depart-

ment, completed a proposed adverse action form suggesting that Wright be terminated.

Wright requested a pre-termination hearing concerning his proposed discharge, but was not afforded one. A final adverse action form notifying Wright of his discharge was prepared on December 20, 1993. Wright appealed his termination to Dave Bandy, Glynn County Personnel Director. When Bandy discovered that Wright had not been given a pre-termination hearing, he recommended to the Board that Wright be reinstated on administrative leave, with pay retroactive to the date of his termination. Bandy's recommendation was adopted by the Board on January 20, 1994. (Def.Mot.Summ.J., Ex. E; Wright Depo., Ex. D–3, D–4, D–5, and D–7). A new proposal of adverse action, suggesting Wright's termination, was entered the next day.

A pre-termination hearing was held on February 1, 1994, before Keith Flanagan, Director of Public Works. At the hearing, Wright was presented with the evidence against him and given an opportunity to examine witnesses and explain his past actions. (Def.Mot.Summ.J., Ex. F) After the hearing, Flanagan issued a final adverse action notification recommending termination. Wright then sought a hearing before Bandy. The request was granted and another hearing was held.

In a letter, dated March 3, 1994, Bandy recommended that the Board confirm the termination of Wright. Wright was discharged by the Board that evening. He stopped receiving compensation after that date. (Wright Depo., pp. 19, 22–23).

## DISCUSSION

### I. Summary Judgment

■ Both parties have moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Summary judgment requires the movant to establish the absence of genuine issues of material fact, such that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153, 90 S.Ct. 1598, 1606, 26 L.Ed.2d 142 (1970); *Lordmann Enterprises, Inc. v. Equicor, Inc.*, 32 F.3d 1529, 1532 (11th Cir.1994). Material

facts are only those facts that legitimately affect the legal result of the case. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

■ After the movant meets this burden, "the non-moving party must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Co., Inc.*, 32 F.3d 520, 524 (11th Cir.1994), *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The non-moving party to a summary judgment motion need make this showing only after the moving party has satisfied its burden. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991). The court should consider the pleadings, depositions and affidavits in the case before reaching its decision. Fed.R.Civ.P. 56(c). All reasonable inferences will be made in favor of the non-movant. *Griesel v. Hamlin*, 963 F.2d 338, 341 (11th Cir.1992).

### II. Due Process

■ Section One of the Fourteenth Amendment to the United States Constitution prohibits the deprivation of life, liberty, or property without due process of law. Wright claims that his procedural due process rights were violated by the manner of his termination. The Supreme Court has made it clear that a property interest exists in continued employment when state law creates such an interest. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985). Both parties to this litigation have assumed that such a property interest exists in this case. The Court will also assume the existence of such a property interest for the purposes of this Order.

As a property interest has been assumed, the question becomes, what process is due? *Loudermill*, at 541, 105 S.Ct. at 1492–93. Wright has argued that he was entitled to a full evidentiary hearing where witnesses could be cross-examined. However, case law does not support his argument. In *Loudermill*, the Supreme Court stated that a "tenured employee is entitled to oral or written

notice of the charge against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id.* at 546, 105 S.Ct. at 1495.

A pre-termination "hearing is not a mini-trial and 'need not definitely resolve the propriety of the discharge. It should be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action.' " *McKinney v. Pate,* 20 F.3d 1550, 1561 (11th Cir.1994) (citing *Loudermill,* at 545–46, 105 S.Ct. at 1495), *cert. denied,* —— U.S. ——, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995). Due process requires "a pre-termination opportunity to respond coupled with post-termination administrative procedures" provided by state law. *Loudermill,* at 547, 105 S.Ct. at 1496.

The failure to provide a pre-termination hearing will not, however, necessarily give rise to a claim under § 1983. A deprivation must be complete before a court may act. The Supreme Court has stated that a procedural due process violation "is not complete unless and until the State fails to provide due process." *Zinermon v. Burch,* 494 U.S. 113, 126, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990). A procedural deprivation can be cured by a later procedural remedy. *McKinney,* at 1557. A constitutional remedy under 42 U.S.C. § 1983 only arises when a state "refuses to provide a process sufficient to remedy the procedural deprivation." *Id.; See also Thornquest v. King,* 61 F.3d 837, 843 n. 10 (11th Cir.1995); *Bussinger v. City of New Smyrna Beach, Fla.,* 50 F.3d 922, 925–26 (11th Cir.1995).

In the case at bar, it is undisputed that Wright did not receive a proper hearing after the filing of the December 10, 1993, proposed adverse action form. All due process defects were cured, however, by later county action. When it was discovered that Wright did not receive a pre-termination hearing, he was reinstated with full, retroactive pay. He was then afforded a hearing where the evidence against him was presented and he was given an opportunity to respond. Wright may not have been given a full trial-like procedure where witnesses were sworn and cross-examined. Due process, however, does not require such an elaborate drama. *Loudermill,* at 546, 105 S.Ct. at 1495. Wright's pre-termination hearing met the requirements of procedural due process.

Furthermore, Wright has not taken advantage of any post-termination remedies that are available to him under Georgia law. State court review of wrongful termination claims is proper when a state court has the power to review and remedy improper termination and that review is consistent with the concerns of due process. *McKinney,* at 1563. The State of Georgia provides an available and adequate state law remedy for wrongful termination. *See Savannah College of Art and Design, Inc. v. Nulph,* 265 Ga. 662, 460 S.E.2d 792 (1995); *Brownlee v. Williams,* 233 Ga. 548, 212 S.E.2d 359 (1975).

The Court concludes that Wright received all the process that was due. Furthermore, even if the Board had not provided full due process, Wright failed to meet the requirements for a completed procedural due process claim. The Board is entitled to summary judgment on this issue.

### III. *Freedom Of Speech*

Wright also argues that his termination resulted in an unconstitutional deprivation of his First Amendment speech rights. He claims that he was punished for his thoughts and speech, because his views about a fellow employee were not "politically correct." Interestingly, for much of our country's history, it was believed that the Constitution offered no protection to employees who were terminated because of their speech and opinions. Justice Holmes, before assuming his position on the United States Supreme Court, stated, "[A policeman] may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." *Connick v. Myers,* 461 U.S. 138, 143–44, 103 S.Ct. 1684, 1688, 75 L.Ed.2d 708 (1983) (citing *McAuliffe v. Mayor of New Bedford,* 155 Mass. 216, 220, 29 N.E. 517, 517 (1892)). Times have changed.

Wright is correct when he asserts that the speech of public employees is generally protected by the First Amendment. *Connick,* at 147, 103 S.Ct. at 1690. It is clear, however, that a public employee does not possess an absolute, unfettered right to free speech. *Pickering v. Bd. of Educ. of Township High School Dist. 205,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968). In the Eleventh Circuit, a four-part test is used to evaluate employee speech dismissal claims[1]. *Morgan v. Ford,* 6 F.3d 750, 754 (11th Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 2708, 129 L.Ed.2d 836 (1994). In this test, the threshold issue is "whether the employee's speech may be 'fairly characterized as constituting speech on a matter of public concern.' " *Id.* (citations omitted).

When speech that results in an employee's termination is not a matter of public concern, a court should not scrutinize the reasons for discharge. *Connick,* at 146, 103 S.Ct. at 1689–90. The Supreme Court has stated that government officials must be given "wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Id.* Dismissal for such speech, even if unfair, mistaken, or unreasonable, simply does not rise to the level of a Constitutional violation. *Id.*

Of course, the articulation of this abstract standard does little in the concrete. Once it is stated, the question becomes, what type of speech is not a matter of public concern? *Connick* opines, "Whether an employee's speech addresses a matter of public concern must be determined by the content, form and context of a given statement as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. at 1690. Employee speech must relate to political, social, or other community concerns before it can be classified as public. *Morgan,* at 754 (*citing, Connick,* at 146, 103 S.Ct. at 1689–90). Only if the employee spoke on behalf of the public as a citizen, rather than for himself as an employee, will he be protected from termination. *Id.* An employee's attempts to make the speech public and his motivation in speaking can be considered by a court in determining whether the speech is public. *Id.*

Recently, the Sixth Circuit had the opportunity to consider this issue. *Dambrot v. Central Michigan Univ.,* 55 F.3d 1177 (6th Cir.1995). In that case, Keith Dambrot was terminated from his position as head basketball coach for Central Michigan University because of his use of the word "nigger." *Id.* at 1180. He used the slur during a locker room meeting during a game against Miami University of Ohio. *Id.* Reportedly, he asked permission of team members before he used it. He then uttered the epithet several times in reference to players and coaches. University officials terminated Dambrot, despite the fact that he may have intended the word's use in a "positive and reinforcing" manner.[2] *Id.*

In reaching their decision, the Sixth Circuit concluded that Dambrot's termination was proper as his speech did not touch a matter of public concern. *Id.* at 1187. Regardless of the message Dambrot was trying to convey, the court found that it was delivered to a private group and intended for motivational purposes. The court held that player motivation may be highly relevant to a coach. It did not, however, create an issue of public concern. *Id.* at 1187–88.

In the case at bar, the crushing weight of reality requires the Court to find that Wright

---

1. The elements of this test are:
 1. Can the employee's speech be characterized as a matter of public concern?
 2. If so, do the employee's First Amendment interests outweigh the state employer's interest of promoting efficiency in the services it offers?

 If employee meets the first two elements, the fact finder must then determine:
 3. Did the employee's speech play a substantial role in the state's decision to take an adverse employment action?

 4. Can the state prove, by a preponderance of the evidence, that it would have taken the adverse action even in the absence of the employee's protected speech?

2. The Court is hesitant to believe that the term "nigger" could ever be used in a positive or reinforcing manner. Nevertheless, Dambrot's claim is bolstered by the support of nine black team members who joined his lawsuit against the university. *Dambrot,* at 1179 n. 1.

did not speak about matters of public concern. Wright admits that he repeatedly and persistently referred to one of his black co-workers as a "nigger." It is quite likely that he used the epithet to refer to other blacks in the context of his employment. Wright admits that he did not intend for his statements to be broadcast to the general public.

While Wright claims that he sometimes used the racial slur in jest, it is clear that he also used it to insult and degrade a black co-worker. Such a motive cannot be said to relate to political, social, or other community concerns. He said it to express his private anger and prejudice. His speech and opinions reveal no issues of public importance.

As the Court has found Wright's speech to fall outside the realm of public concern, the Court is foreclosed from using First Amendment analysis to examine the propriety of his dismissal. *Connick*, at 146, 103 S.Ct. at 1689–90. While Wright's words are entitled to some form of First Amendment protection, the Court must give deference to Glynn County's decision to terminate. Wright would be unable to prevail on this issue if it were brought to trial. The Board has met its burden for summary judgment.

## IV. *Fair Labor Standards Act*

 Finally, Wright also argues that he has a claim for non-compensated, overtime labor under the provisions of FLSA. 29 U.S.C. § 207(a)(1) states:

Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

The Board denies that Wright worked any non-compensated overtime.

In addition, it claims that it is entitled to summary judgment since Wright has been unable to name the exact dates on which he worked unpaid overtime. At his deposition, however, Wright stated that for several years prior to his termination, he was scheduled to work ten hours a day, four days a week, but actually worked longer hours. (Wright Depo., p. 43). Wright claims that he was paid only for forty hours of work per week, despite the fact that he was regularly required to work from 7:15 A.M. until sometime around 6:30 P.M. (Wright Depo. p.p. 41–42).

Since Wright claims that he regularly worked uncompensated overtime hours, a showing of an exact number of hours is not needed to overcome a motion for summary judgment. The Court must construe the evidence in the light most favorable to the non-moving party. *Griesel,* at 341. The Board admitted in its brief that a factual dispute exists as to whether Wright worked any non-compensated overtime hours. The Court finds that this dispute gives rise to a genuine issue of material fact. Therefore, summary judgment on this issue will not be granted.

## CONCLUSION

The Court has found that the Board did not violate the Fourteenth Amendment or the First Amendment in its termination of Wright. A genuine issue of material fact exists, however, as to whether provisions of FLSA have been violated. Wright's motion for summary judgment is, therefore, **DENIED**. The Board's motion for summary judgment is **GRANTED in PART and DENIED in PART**. The Clerk is directed to enter the appropriate judgment.

**SO ORDERED.**