# United States Court of Appeals for the Federal Circuit

---

**IN RE PAMELA GELLER** AND
**ROBERT B. SPENCER**

---

2013-1412

---

Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board, in Serial No. 77940879.

---

Decided: May 13, 2014

---

DAVID YERUSHALMI, American Freedom Law Center, of Washington, DC, argued for appellants.

THOMAS L. CASAGRANDE, Associate Solicitor, United States Patent and Trademark Office, of Alexandria, Virginia, argued for appellee. With him on the brief were NATHAN K. KELLEY, Solicitor, BENJAMIN T. HICKMAN, and Christina Hieber, Associate Solicitor.

---

Before NEWMAN, O'MALLEY, and WALLACH, *Circuit Judges.*

WALLACH, *Circuit Judge.*

Applicants Pamela Geller and Robert B. Spencer ("Appellants") appeal from the Trademark Trial and Appeal Board's ("Board") refusal to register the mark

STOP THE ISLAMISATION OF AMERICA in connection with the recited services of "understanding and preventing terrorism." J.A. 27. The Board found the mark contains "matter which may disparage" a group of persons in violation of § 2(a) of the Trademark Act. Because the Board's finding is supported by substantial evidence and in accordance with law, this court affirms.

BACKGROUND

In February 2010, Appellants filed an intent-to-use application to register the mark STOP THE ISLAMISATION[1] OF AMERICA in connection with "[p]roviding information regarding understanding and preventing terrorism." J.A. 27. The Examining Attorney refused the application on January 19, 2011, on the ground that the mark may be disparaging to American Muslims pursuant to § 2(a) of the Trademark Act, 15 U.S.C. § 1052(a) (2006). Appellants filed an appeal to the Board, which affirmed the § 2(a) refusal. In reaching this conclusion, the Board considered the likely meaning of the mark, and then determined whether that meaning was likely to disparage "'a substantial composite of the referenced group.'" J.A. 2–3 (quoting *In re Lebanese Arak Corp.*, 94 U.S.P.Q.2d 1215, 1217 (T.T.A.B. 2010)).

The Board found the term "Islamisation," as used in the mark, had two likely meanings: (1) "the conversion or conformance to Islam" ("the religious meaning"), J.A. 8; and (2) "a sectarianization of a political society through efforts to 'make [it] subject to Islamic law'" ("the political meaning"), J.A. 9 (alteration in original). The religious meaning was supported by dictionary definitions and

---

[1] The Board and the parties alternate between spelling "Islamisation" with an "s" ("Islamisation") and with a "z" ("Islamization"). All agree the spelling variation is immaterial.

evidence of how the term was used in the marketplace, J.A. 3–8, and the Board found this meaning was "more reflective of the public's current understanding of the term." J.A. 12. The political meaning of "Islamisation," in turn, was supported by various publications by "professionals, academics and religious and legal experts." J.A. 9. Such evidence was "less widely available" and "not necessarily reflective of the general public's understanding" of Islamisation. J.A. 11. Nevertheless, the Board found it established "a second meaning" of Islamisation, "at least to academic, professional, legal and religious experts." J.A. 12.

The Board determined the mark may be disparaging to American Muslims under both meanings of "Islamisation." J.A. 23. With respect to the religious meaning, the Board found the mark was disparaging to American Muslims because "[t]he admonition in the mark to STOP sets a negative tone and signals that Islamization is undesirable and is something that must be brought to an end in America." J.A. 16. Moreover, the Board found Appellants' proposed use of the mark for "understanding and preventing terrorism" resulted in "a direct association of Islam and its followers with terrorism."[2] J.A. 16.

---

[2] Appellants do not contest the Board's reliance on an online dictionary definition of "terrorism" as "'the use of violence and threats to intimidate or coerce, esp. for political purposes.'" J.A. 4 (quoting J.A. 73 (*Terrorism*, Dictionary.com, http://dictionary.reference.com/browse /terrorism (as retrieved on Apr. 28, 2010))). Other more specific definitions may be found in various treaties (*see, e.g.*, International Convention for the Suppression of Terrorist Bombings art. 2, Dec. 15, 1997, 116 Stat. 721, 2149 U.N.T.S. 284, 285–86), and national statutes (*see, e.g.*, 18 U.S.C. § 2331(1), (5) (2012)), but the broad definition is certainly adequate for the purposes of this case.

Because "the majority of Muslims are not terrorists and are offended by being associated as such," the Board determined the mark was disparaging under the religious meaning of Islamisation. J.A. 16.

The Board also found the mark would be disparaging under the political meaning of Islamisation. J.A. 19. It determined that even this narrower definition does not "mandate the use of violence or terrorism," so the application's suggestion that political Islamisation must be "stop[ped]" to "prevent[ ] terrorism" would be disparaging to a substantial composite of American Muslims. J.A. 18–19, 21. The Board accordingly affirmed the Examining Attorney's refusal to register the mark under § 2(a) of the Trademark Act.

Appellants filed this timely appeal. This court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(4)(B) (2012).

### DISCUSSION

On appeal, Appellants argue there is no substantial evidence to support the Board's finding that the proposed mark may be disparaging in violation of § 2(a) of the Trademark Act. They contend the Board improperly relied "on arbitrary and anecdotal evidence" in determining the mark's meaning and in finding that meaning may disparage American Muslims. Appellants' Br. 2, 13, 19.

Section 2(a) of the Trademark Act provides that the Board may refuse an application when the trademark "[c]onsists of or comprises . . . *matter which may disparage* . . . persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute." 15 U.S.C. § 1052(a) (emphasis added). Although neither party was able to identify a prior case in this court or its predecessor setting forth the legal analysis for a § 2(a) refusal based on disparagement, all parties agree the proper inquiry was set forth by the Board in *In re Lebanese Arak Corp.*:

(1) what is the likely meaning of the matter in question, taking into account not only dictionary definitions, but also the relationship of the matter to the other elements in the mark, the nature of the goods or services, and the manner in which the mark is used in the marketplace in connection with the goods or services; and

(2) if that meaning is found to refer to identifiable persons, institutions, beliefs or national symbols, whether that meaning may be disparaging to a substantial composite of the referenced group.

*In re Lebanese Arak Corp.*, 94 U.S.P.Q.2d at 1217; *see also Harjo v. Pro-Football, Inc.*, 50 U.S.P.Q.2d 1705, 1740–41 (T.T.A.B. 1999), *rev'd on other grounds*, 284 F. Supp. 2d 96 (D.D.C. 2003). A mark may disparage when it "'dishonor[s] by comparison with what is inferior, slight[s], deprecate[s], degrade[s], or affect[s] or injure[s] by unjust comparison.'" *Pro-Football, Inc. v. Harjo*, 284 F. Supp. 2d 96, 124 (D.D.C. 2003) (quoting *Harjo*, 50 U.S.P.Q.2d at 1737 n.98).

The determination that a mark may be disparaging "is a conclusion of law based upon underlying factual inquiries." *Cf. In re Mavety*, 33 F.3d 1367, 1371 (Fed. Cir. 1994) (applying that standard with respect to whether a mark is "scandalous" under § 2(a)). The Board's factual findings are reviewed for substantial evidence, "while its ultimate conclusion as to registrability is reviewed de novo." *In re Fox*, 702 F.3d 633, 637 (Fed. Cir. 2012).

I.

The first prong of the disparagement test determines "the likely meaning of the matter in question." *In re Lebanese Arak Corp.*, 94 U.S.P.Q.2d at 1217. The Board found the term ISLAMISATION used in Appellants' mark

has two likely meanings: the religious meaning and the political meaning.[3]   On appeal, Appellants argue the Board "ignore[d] the overwhelming evidence in the record that the term 'Islamisation' has *only* been used in the public domain to refer to a political and military process replacing civilian laws with Islamic religious law."  Appellants' Br. 13 (emphasis added).

To the extent Appellants argue the political meaning of Islamisation is the *sole* likely meaning under prong one, they are incorrect.  The Board relied on three separate types of evidence in support of the religious meaning.  First, it considered dictionaries that listed the primary definition of "Islamize" as "'to convert'" or "'conform'" to Islam.  J.A. 4 (quoting, *e.g.*, J.A. 58 (*Islamize*, Dictionary.com, http://dictionary.reference.com (as retrieved on Apr. 28, 2010))); J.A. 1040 (*Islamize*, YourDictionary, http://yourdictionary.com/Islamize (as retrieved on Sept. 1, 2010))); *see also* J.A. 3 n.3 ("The definitions indicate that 'Islamization' is the noun form of the transitive verb 'Islamize.'").   Next, the Board considered certain essays posted on Appellants' website, www.sioaonline.com,[4] which were "featured immediately underneath the website's STOP THE ISLAMIZATION OF AMERICA banner."  J.A. 6.  Two of these essays opposed construction of mosques in the United States, and another essay discussed an ad campaign to provide "assistance" to Muslims considering leaving the Islamic faith.  J.A. 5–6, 1043–46, 1064–67, 1075–77.  Finally, the Board considered readers'

---

[3]   As noted above, the "religious meaning" of Islamisation is "the conversion or conformance to Islam," J.A. 8, and the "political meaning" is "a sectarianization of a political society through efforts to 'make [it] subject to Islamic law,'" J.A. 9.

[4]   This website is no longer available (last checked Mar. 17, 2014).

comments posted on Appellants' website as "reflect[ive of] the website's message of stopping the spread of Islam in the United States."  J.A. 6.

Appellants do not challenge the Board's reliance on online dictionaries, but instead assert error in the remainder of the Board's analysis of "Islamisation."  They argue the Board improperly relied on "irrelevant essays and arbitrarily selected anonymous 'comments' posted to Appellants' blog."  Appellants' Br. 13.

Appellants contend the essays posted on their website do not advocate suppression of the Islamic faith, but only oppose political Islamisation.  The Board disagreed, as do we.  The first essay they discuss is titled "[Stop the Islamisation of America] Mosque Manifesto: All Mosques are Not Created Equal, A Handy Guide to Fighting the Muslim Brotherhood."  J.A. 1043.  Appellants characterize this essay as merely opposing "Islamist Muslim Brotherhood groups" that "use mosque-building as a political tool to accomplish Islamisation."  Appellants' Br. at 14.  This is an overly narrow interpretation of the "Mosque Manifesto" essay, which provides tips for opposing "huge monster mosque[s]" proposed in people's communities.  J.A. 1044.  Although portions of the essay refer to political forces such as the Muslim Brotherhood, the article as a whole implicates Islam more generally.  *See, e.g.*, J.A. 1045 (quoting a source that "80% of American mosques were controlled by 'extremists'"); J.A. 1043 ("As we have been reminded time after time after grisly Islamic terror plots have been exposed, there is always a mosque, and the imprimatur of a cleric, behind every operation.").  Taken generally, as Appellants do, mosques in this country are respectable and respected community religious institutions.  Substantial evidence supports the Board's finding that the "Mosque Manifesto" essay advocates

suppression of the Islamic faith, taught and practiced in those places of prayer.[5]

Appellants also challenge the Board's reliance on the essay, "Detroit Transit Sued for Nixing [Stop the Islamisation of America] 'Leaving Islam?' Bus ads."  J.A. 1075. They contend the essay "merely recounts the debate over an advertisement . . . to provide Muslims who have offended Islamists with a refuge from retaliatory violence." Appellants' Br. 16.   The record supports the Board's finding that the "Bus ads" essay is not about political beliefs, but rather about the Islamic faith.  It describes an ad campaign run by Appellants and others "in response to bus ads in Florida inviting people to *convert to Islam*." J.A. 1076 (emphasis added).  As characterized by Appellants, the ads offered "assistance" to people considering leaving Islam, and suggested those individuals would otherwise be subject to "retaliatory violence" by other Muslims.  Appellants' Br. 16.  This essay supports the Board's conclusion that Appellants used the mark in the context of stopping the spread of the Islamic faith.

Appellants further argue the Board erred in relying on "cherry-picked anonymous comments" posted on their website.  Appellants' Br. 17.  They contend such comments "are *not* indicative of how Appellants use the Mark in the marketplace" and "are not even remotely representative of 'consumers' of Appellants[], but rather a biased selection of people who leave comments at blogs." *Id.*  The Board considered these drawbacks of anonymous public comments, and noted "the probative value of the

_____

[5]    Another essay on Appellants' website opposed a mosque and Islamic Center being built in New York City near the site of the former World Trade Center.  J.A. 1081–82.  The Board was correct that this essay also addresses the spread of the Islamic faith, not political Islamisation.  *See* J.A. 6.

blog comments . . . is less than that of the articles themselves due to the anonymity of the authors." J.A. 8. With that caveat, the Board properly found the comments "provide additional insight into the public's perception of and reaction to applicants' STOP THE ISLAMISATION OF AMERICA mark and services as used in the marketplace." J.A. 8. The referenced comments reflect the religious meaning of Islamisation, and evidence a desire to stop the spread of Islam in America. *See* J.A. 6–7 (quoting comments) ("Islam is evil"; "[T]here's only one thing you can do and that's say no to Islam and the [I]slamization of America"; "[T]he name you chose [Stop the Islamisation of America] does imply that you wish to stop [I]slam in this country . . . ."). The Board did not err in concluding that such comments showed the religious meaning of Islamisation.

Finally, the remaining evidence does not establish the political definition of "Islamisation" as the sole likely meaning. The online dictionary definitions in the record list the political meaning as secondary. J.A. 4 (quoting, *e.g.*, J.A. 1039 (*Islamize*, Encarta, http://encarta.msn.com /encnet/features/dictionary/DictionaryResults.aspx?refid= 1861622547 (as retrieved on Sept. 1, 2010) ("2. [M]ake subject to Islamic law: to cause people, institutions, or countries to follow Islamic law."))). As further support, Appellants submitted Congressional testimony, course materials, academic articles, and a doctoral dissertation using the term "Islamisation" in its political sense. The Board considered these additional sources but found they were "less widely available" and "not necessarily reflective of the general public's understanding of the meaning of applicants' mark." J.A. 11–12. The Board, however, found Appellants had established the political definition as *one* likely meaning of Islamisation, and therefore considered both the religious and political meanings in the second part of the analysis.

II.

The second prong of the disparagement inquiry asks whether the likely meaning identified in prong one "is found to refer to identifiable persons, institutions, beliefs or national symbols," and if so, whether that meaning "may be disparaging to a substantial composite of the referenced group." *In re Lebanese Arak Corp.*, 94 U.S.P.Q.2d at 1217. The Board found both meanings of Islamisation refer to all American Muslims. J.A. 13 (noting that Appellants agreed). It then determined that the mark may be disparaging to American Muslims under both the religious and the political meanings of Islamisation. J.A. 23.

With respect to the religious meaning, the Board found the mark's admonition to "STOP" Islamisation in America "sets a negative tone and signals that Islamization is undesirable and is something that must be brought to an end in America." J.A. 16. Moreover, it determined that using the mark in connection with preventing terrorism "creates a direct association of Islam and its followers with terrorism." J.A. 16. The Board explained that "the majority of Muslims are not terrorists and are offended by being associated as such." J.A. 16. The Board listed multiple sources where Muslims stated they were concerned by, e.g., "anti-Muslim sentiment that automatically associates Islam with terrorism." J.A. 16–17 (quoting J.A. 1020 (Andy Grimm, *Show of Support for Muslims: Religious Leaders Call for Tolerance Amid Tensions*, Chicago Tribune, Sept. 12, 2010, at C10)); *see also* J.A 16 (quoting J.A. 53 (Bob Makin, *Muslims Say Terrorists Have Hijacked Their Faith*, Courier News, June 2, 2008) ("We believe [Islamic terrorist] is not the right terminology to use, because it links something very positive, like Islam, with the word 'terrorist.'")).

On appeal, Appellants argue this evidence "has nothing to do with Appellants' Mark literally or in context of

the meaning of the terms used in the marketplace of ideas." Appellants' Br. 21. This argument merely restates Appellants' prong-one arguments about the mark's likely meaning. As discussed above, the Board properly found that one meaning of Islamisation—the "more reflective" meaning—is to convert to Islam. J.A. 12. Appellants conceded at oral argument that their mark is disparaging under a religious meaning of Islamisation. Oral Arg. at 1:27–52, *In re Geller*, No. 2013-1412 (Mar. 4, 2014), *available at* http://www.cafc.uscourts.gov/oral-argument-recordings/all/geller.html.

Substantial evidence supports the Board's finding that Appellants' mark is also disparaging in the context of the political meaning of Islamisation. J.A. 19. The Board reasoned the political meaning "refers to a political movement to replace man-made laws with the religious laws of Islam," which does not "mandate the use of violence or terrorism." J.A. 19. The Board found associating such political beliefs with "preventing terrorism," as recited in the application, "creates an association with terrorism that would be disparaging to a substantial composite of Muslims, whether or not they embrace [political] Islamization." J.A. 21–22.

Appellants challenge the Board's determination that political Islamisation includes nonviolent activity, and instead contend that "all of the record points to the fact that Islamisation ultimately includes terrorism." Oral Arg. at 26:20–33. Appellants maintain their mark to "STOP" Islamisation therefore does not disparage "loyal, patriotic American Muslims." Appellants' Br. 25. Contrary to Appellants' contention, nothing in the record suggests that the political meaning of Islamisation requires violence or terrorism. Appellants' own evidence describes "political Islamists" as "by and large, people who are non-violent, yet . . . have an ideological agenda," and states that "Islamism manifests itself in activist agendas that span the complete spectrum from *democratic politics*

to violent efforts aimed at imposing Shariah law world-wide." J.A. 20 (emphasis added) (internal quotation marks and citations omitted). To the extent Appellants established that one likely meaning of Islamisation is a political movement to spread Islamic law, they certainly did not show that violence is required to achieve that goal. The political meaning of Islamisation does not require violence or terrorism, and the Board properly found that associating peaceful political Islamisation with terrorism would be disparaging to a substantial composite of American Muslims. *See* J.A. 21–23. The Board's refusal of Appellants' mark as disparaging matter under § 2(a) is therefore affirmed.

## CONCLUSION

For the foregoing reasons, and because this court finds Appellants' remaining arguments unpersuasive, the Board's refusal of Appellants' mark STOP THE ISLAMISATION OF AMERICA is affirmed.

**AFFIRMED**