O’MALLEY, Circuit Judge,
with whom WALLACH, Circuit Judge, joins, concurring.
I agree that the disparagement provision of 15 U.S.C. § 1052(a) (“§ 2(a)”) is unconstitutional on its face. I agree, moreover, that § 2(a) cannot survive the searching constitutional scrutiny to which the majority subjects it under the First Amendment to the United States Constitution. On this point, the majority rightly dispenses with this court’s precedent in In re McGinley, 660 F.2d 481 (C.C.P.A.1981) and its progeny. I write separately, however, because, I believe § 2(a) is also unconstitutionally vague, rendering it unconstitutional under the Fifth Amendment to the United States Constitution.
While the majority acknowledges the vague and uncertain application of § 2(a), Maj. Op. 1341-43, it finds that “[a]ll we need say about the uncertainty here, however, is that it contributes significantly to the chilling effect on speech,” id. at 1342-43. I agree with the majority’s concern about the uncertain nature of § 2(a), but believe those concerns should lead us to do more than note 2(a)’s undoubted chilling effect on speech. I find § 2(a)’s disparagement provision to be so vague that I would find it to be unconstitutional, whether or not it could survive Appellant’s First Amendment challenge.
Discussion
Section 2(a) provides that the Trademark Trial and Appeal Board (“Board”) may refuse an application when the trademark “[cjonsists of or comprises ... matter which may disparage ... persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute.” (emphasis added). As the majority correctly notes, the language of the statute .creates “uncertainty as to what might be deemed disparaging.” Maj. Op. 1341-42. Both would-be applicants and the Board are left to guess at what may have the potential to disparage a broad range of persons, institutions, symbols, and even undefined “beliefs.” And, they are left to guess at whether “may disparage” is the equivalent of bringing into contempt or disrepute, or is a distinct category of impropriety from these latter evils.
Where, as here, the language of a statute evades clarity, “[t]he area of proscribed conduct will be adequately defined and the deterrent effect of the statute contained within constitutional limits only by authoritative constructions sufficiently illuminating the contours of an otherwise vague prohibition.” Dombrowski v. Pfis-ter, 380 U.S. 479, 490-91, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). The Board has devel *1359 oped a two-step test to determine whether a mark is disparaging:
(1) What is the likely meaning of the matter in question, taking into account not only dictionary definitions, but also the relationship of the matter to the other elements in the mark, the nature of the goods or services, and the manner in which the mark is used in the marketplace in connection with the goods or services; and
(2) If that meaning is found to refer to identifiable persons, institutions, beliefs or national symbols, whether that meaning may be disparaging to a' substantial composite of the referenced group.
Trademark Manual of Exam. Proc. (“TMEP”) § 1203.03(b)(i) (Oct.2015 ed.) (citing, inter alia, In re Getter, 751 F.3d 1355, 1358 (Fed.Cir.2014); Harjo v. Pro-Football Inc., 50 U.S.P.Q.2d 1705, 1740-41 (T.T.A.B.1999)). Thus, the Board has concluded that a mark may disparage within the meaning of § 2(a) when a majority of the Board believes it “dishonor[s] by comparison with what is inferior, slightfs], deprecate[s], degrade[s], or affectfs] or injure[s] by unjust comparison.” Pro-Football, Inc. v. Harjo, 284 F.Supp.2d 96, 124 (D.D.C.2003) (internal quotation marks omitted) (quoting Harjo v. Pro-Football, Inc., 50 U.S.P.Q.2d 1705, 1737 n. 98 (T.T.A.B.1999)).
The two-step test does little to alleviate § 2(a)’s uncertainty. Indeed, by adding the caveat that a mark can be rejected whenever a mark’s meaning may be disparaging to “a substantial composite” of an “identifiable” group, (TMEP §. 1203.03(b)(i)), the TMEP compounds the confusion the statute engenders. Thus a mark need only potentially disparage a subset of any group as long as that group can be “identified].”
One need only examine the disparate ways in which § 2(a) has been applied to see the confusion. While it is true that a “fertile legal ‘imagination can conjure up hypothetical cases in which the meaning of [disputed] terms will be in nice question,’ ” Grayned v. City of Rockford, 408 U.S. 104, 112 n. 15, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (alteration in original) (quoting Am. Commc’ns Ass’n v. Douds, 339 U.S. 382, 412, 70 S.Ct. 674, 94 L.Ed. 925 (1950)), the arbitrary application of § 2(a) is easily demonstrated. The majority discusses numerous examples of inconsistent registration decisions. Maj. Op. 1342 n. 7. These include examples where there is no conceivable difference between" the applied-for marks, yet one is approved and the other rejected. Compare HAVE YOU HEARD SATAN IS A REPUBLICAN (Trademark Application Serial No. 85,077,647) (rejected because it disparaged the Republican Party), with THE DEVIL IS A DEMOCRAT, Registration No. 85,525,066 (accepted and later abandoned for other reasons). I agree with the majority that there appears to be “no rationale for the PTO’s seemingly arbitrary registration decisions, let alone one that would give applicants much guidance.” Maj. Op. 1342 n. 7.[1]
*1360 For § 2(a) to survive a vagueness challenge, the Supreme Court requires it “give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.” Grayned, 408 U.S. at 108, 92 S.Ct. 2294. Further, “if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.” Id. Given the subjective and hypothetical language of the statute and its well-documented, inconsistent application by the Board, § 2(a) is void for vagueness under even a lax test for vagueness. But the standard we should apply to § 2(a) is not lax.
“The degree of vagueness that the Constitution tolerates ... depends in part on the nature of the enactment.” Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). “[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech ..., a more stringent vagueness test should apply.” Id. at 499, 102 S.Ct. 1186. The First Amendment concerns articulated by the majority support application of a “more stringent vagueness test” — one that § 2(a) simply cannot pass.
a. First Amendment Concerns Require a Stringent Vagueness Test
As the majority points out, “[i]t is beyond dispute that § 2(a) discriminates on the basis of content.” Maj. Op. 1335. “[T]he test for disparagement — whether a substantial composite of the referenced group would find the mark disparaging— makes clear that it is the nature of the message conveyed by the speech which is being regulated. If the mark is found disparaging by the referenced group, it is denied registration.” Id. at 1335. Indeed, the problems with § 2(a) are more substantial than the majority even acknowledges — not only is a trademark’s registra-bility adjudged by the message it conveys, but the message conveyed is adjudged by the potential sensibilities of a broad range of potential listeners.
Under First Amendment principles, “content-based regulation of speech ... raises special First Amendment concerns because of its obvious chilling effect on free speech.” Reno v. ACLU, 521 U.S. 844, 872, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). Indeed, “[bjroad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms.” Edenfield v. Fane, 507 U.S. 761, 777, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993) (internal quotation marks omitted) (quoting NAACP v. Button, 371 U.S. 415, 438, 83-S.Ct. 328, 9 L.Ed.2d 405 (1963)). The Supreme Court’s emphasis on precision for content-based regulations is premised on its understanding of
at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way. When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech.
FCC v. Fox Television Stations, Inc., — U.S. -, 132 S.Ct. 2307, 2317, 183 *1361 L.Ed.2d 234 (2012) (citing Grayned, 408 U.S. at 108-109, 92 S.Ct. 2294).
b. Section 2(a) is Void for Vagueness
Section 2(a)’s undeniable chilling effect on speech requires it to pass a “more stringent test” for vagueness in order to pass constitutional muster. Hoffman, 455 U.S. at 498, 102 S.Ct. 1186. Recognizing that due process vagueness challenges are more difficult to sustain where civil regulation — as distinct from criminal penalty provisions — are at issue, I believe § 2(a)’s inherent ambiguity makes it difficult for would-be applicants to discern its boundaries and leads to inconsistent and unreliable actions on the part of the government as it seeks to regulate on the basis of content.
First, the imprecise, content-based regulation of trademark registration affects the types of marks sought by would-be registrants. ‘Vague laws force potential speakers to “ ‘steer far wider of the unlawful zone” ... than if the boundaries of the forbidden areas were clearly marked.’ ” Brown v. Entm’t Merchants Ass’n, — U.S. -, 131 S.Ct. 2729, 2743, 180 L.Ed.2d 708 (2011) (quoting Baggett v. Bullitt, 377 U.S. 360, 372, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964)). The majority opinion rightly concludes that, given the Board’s inconsistency, “the public would have a hard time drawing much reliable guidance.” Maj. Op. 1342. The “uncertainty of speech-affecting standards has long been recognized as a' First Amendment problem,” and the uncertainty inherent in' § 2(a) “contributes significantly to the chilling effect on speech.” Maj. Op. 1342.[2]
Next, the absence of clear standards for the application of § 2(a) provides the government with virtually unlimited ability to pick and choose which marks to allow and which to deny. And neither § 2(a) itself nor the TMEP’s two-step test provides the PTO, the courts, or the public with any certainty as to what may disparage a given subset of any given population or group of believers. That is simply inadequate under the Fifth Amendment. See Nat’l Endowment for the Arts v. Finley, 524 U.S. 569, 588, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998) (“Under the First and Fifth Amendments, speakers are protected from arbitrary and discriminatory enforcement of vague standards.”); Grayned, 408 U.S. at 108-09, 92 S.Ct. 2294 (1972) (“[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.”) (footnotes omitted). Cf. Kolender v. Lawson, 461 U.S. 352, 357-58, 103 S.Ct 1855, 75 L.Ed.2d 903 (1983) (noting in the context of a criminal penalty scheme that, although the vagueness doctrine “focuses both on actual notice to citizens and arbitrary enforcement, we have recognized recently that the more important aspect of vagueness doctrine ‘is not ‘actual notice, but the other principal element of the doc *1362 trine — the requirement that a legislature establish minimal guidelines to govern law enforcement.’ Where the legislature fails to provide such minimal guidelines, a criminal statute may permit ‘a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.’ ” (quoting Smith v. Goguen, 415 U.S. 566, 574, 575, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974))).
Other circuits to have considered the use of the subjective terms connoting insult— like disparagement — have expressed similar concerns about the absence of objective standards governing their application.
In Dambrot v. Central Michigan University, 55 F.3d 1177 (6th Cir.1995), for example, the Sixth Circuit considered the discriminatory harassment policy of Central Michigan University (“CMU”). That policy defined racial and ethnic harassment as:
any intentional, unintentional, physical, verbal, or nonverbal behavior that subjects an individual to an intimidating, hostile or offensive educational, employment or living environment by ... (c) de-meaning or slurring individuals through ... written literature because of their racial or ethnic affiliation; or (d) using symbols, [epithets] or slogans that infer negative connotations about the individual’s racial or ethnic affiliation.
Id. at 1182 (emphases added). The court found the policy impermissibly vague because it required “one [to] make a subjective reference” and because “different people find different things offensive.” Id. at 1184. As such, the policy’s enforcement was too tied to subjective reference and, thus, both failed to “provide fair notice” and gave rise to an “unrestricted delegation of power” to university officials. Id. See also Wynn Oil Co. v. Purolator Chem. Corp., 536 F.2d 84, 86 (5th Cir.1976) (finding the subsection of an “injunction which restrains defendants from ‘slandering and disparaging the Wynn Oil Co. and its products’ [to be] impermissively vague”).
In Ridley v. Massachusetts Bay Transportation Authority, 390 F.3d 65 (1st Cir.2004), the First Circuit upheld the validity of the Massachusetts Bay Transportation Authority’s (“MBTA”) “guideline prohibiting demeaning or. disparaging material,” id. at 93, because, in that case, “there [was] no serious concern about either notice or chilling effects[ ] where there [were] no consequences for submitting a non-conforming advertisement and having it rejected” id. at 94. But that court specifically distinguished the gúidelines at issue — “given the nature of the MBTA’s advertising program and its chief purpose of raising revenue without losing ridership,” id. at 94 — from “the concern over subjective decision making[, which has the] most effect in government licensing schemes” id. at 95. While the trademark registration scheme is not a traditional public forum making use of a licensing scheme to “maintain basic order,” it implicates the “[e]xcessive discretion and vagueness inquiries under the First Amendment” in much the same way. Id. at 94. As the majority notes, trademark registrants receive substantial benefits from the fact of registration, Maj. Op. 1328-29; denial of those benefits based on the subjective views of governmental employees about the potential subjective views of those who might be exposed to the proposed mark is an essentially standardless measure.
In McGinley, we found § 2(a)’s ban on scandalous subject matter, “sufficiently precise to enable the PTO and the courts to apply the law fairly and to notify a would-be registrant that the mark he adopts will not be granted a federal registration.” 660 F.2d at 484. While . I agree that the PTO is capable of “notifying] a would-be registrant” of its decision to deny registration under § 2(a), the law is by no means precise enough to “enable the PTO and the courts to apply [it] fairly.” Id. As *1363 the majority points out, the Board has allowed use of a term by one trademark holder while disallowing use of precisely the same term by another based apparently on its view of how use of that term might be received by the audience the Board has chosen to “identify.” Maj. Op. 1336-38. This fact alone evidences the absence of explicit standards for the application of § 2(a).
As it turns out, the PTO’s Assistant Commissioner was correct in 1939 in expressing concern that “the word ‘disparage’ ... is going to cause a great deal of difficulty in the Patent Office, because ... it is always going to be just a matter of the personal opinion of the individual parties as to whether they think it is disparaging.” Hearing on H.R. 4744 Before the Subcomm. on Trademarks of the H. Comm, on Patents, 76th Cong. 21 (1939) (statement of Leslie Frazer). The Board has likewise commented on the vague and subjective nature of § 2(a). See, e.g., In re In Over Our Heads, 1990 WL 354546, at *1 (T.T.A.B.1990) (“[T]he guidelines for determining whether a mark is scandalous or disparaging are somewhat vague and the determination of whether a mark is scandalous or disparaging is necessarily a highly subjective one.”) (bracketing and quotation marks omitted); Harjo v. Pro-Football, Inc., 1999 WL 375907, at *35 (T.T.A.B.1999) (noting that whether a mark is disparaging “is highly subjective and, thus, general rules are difficult to postulate”).
“It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined.” Grayned, 408 U.S. at 108, 92 S.Ct. 2294. The need for clarity is especially relevant when a law implicates First Amendment rights, as § 2(a) indisputably does. Section 2(a) does not provide a “person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.” Id. And inconsistent, indeed seemingly rudderless, application of § 2(a) demonstrates the “arbitrary and discriminatory enforcement” that occurs when regulations do not “provide explicit standards for those who apply them.” Id.
While I agree with the majority’s thoughtful First Amendment analysis, I do not believe it is the only predicate to the conclusion that § 2(a) is unconstitutional.
Conclusion
For the above reasons, I concur in the majority’s conclusions and separately concur in the result.

. Amici also were easily able to uncover examples of inconsistencies in the application of the § 2(a). See Br. for American Civil Liberties Union, the American Civil Liberties Union of Oregon, and the American Civil Liberties Union of the Nation's Capital as Amici Curiae 22-24 (discussing "a long line of arbitrary and contradictory decisions” as evidenced by the “countless examples of such irregularities,” including, but not limited to, examples where the same mark is rejected in one instance and accepted in another, even for the same use — for example compare MADONNA, In re Riverbank Canning Co., 25 CCPA 1028, 95 F.2d 327 (CCPA 1938) (affirming rejection of mark for use on wines as scandalous), with MADONNA, Registration No. 3,545,635 (accepted for use on wine) (Dec. 16, 2008); and MESSIAS, In re Sociedade Agrícola E. Comerical Dos Vinhos Messias, S.A.R.L., 159 U.S.P.Q. 275 (T.T.A.B.1968) (rejected for use on wine and brandy), with IL MESSIA, Regis *1360 tration No. 4,093,035 (accepted for use on wine) (Jan. 31, 2012)). These examples further highlight the subjective nature of the registration standard under § 2(a): it is an unstable standard that apparently depends on shifting sensibilities over time.

. Numerous amici have come to the same conclusion. See, e.g., Br. for First Amendment Lawyers Ass’n as Amicus Curiae 14 ("The multitude of Section 2(a) cases show that Section 2(a) does not convey 'sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices,’ as required by the Constitution.” (quoting Roth v. United States, 354 U.S. 476, 491; 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957))); Br. for Pro-Football, Inc. as Amicus Curiae 33 n. 13 (“Even if Section 2(a) sought to advance a legitimate state interest, its language is impermissibly vague to advance that interest. The statute provides no guidance as to which trademarks will be deemed disparaging, scandalous, or immoral.”).